47 Mass. App. Ct. 625 (1999)                    625

Natick Auto Sales, Inc. *v.* Department of Procurement and General Services.

Natick Auto Sales, Inc.,[1] & others[2] *vs.* Department of
Procurement and General Services & others[3]
(and a companion case[4]).

Nos. 97-P-1444 & 98-P-1874.

Middlesex. January 7, 1999. - August 25, 1999.

Present: Kass, Kaplan, & Lenk, JJ.

*Commonwealth,* Contracts, Purchasing, Claim against. *Practice, Civil,* Motion
to dismiss, Moot case, Injunctive relief. *Statute,* Construction. *Contract,*
Bidding for contract, Interference with contractual relations. *Injunction.*
*Res Judicata. Collateral Estoppel.*

Discussion of the scope of relief available in a taxpayers' action under G. L.
c. 29, § 63, to enjoin the execution of an allegedly flawed procurement
procedure. [629-632]

A judge of the Superior Court correctly concluded that a claim for damages
brought against the Commonwealth by a disappointed bidder to a public
procurement contract was barred by principles of claim preclusion, where
a taxpayers' action for injunctive relief under G. L. c. 29, § 63, brought
against the Commonwealth by the bidder and forty of its employees had
previously been dismissed: the plaintiff was the true party in interest in
both actions and it had improperly split its claims. [632-633]

Claims brought by an unsuccessful bidder, including a claim under G. L.
c. 93A, against competitors in a public procurement contract bid were
properly dismissed on a motion for summary judgment, where nothing in
the record demonstrated that the plaintiff had any reasonable expectation of
proving either improper motive or improper means in the defendants'
conduct. [633-634]

Civil action commenced in the Superior Court Department on
February 24, 1997.

[1]The complaint names as plaintiff AMI Municipal Vehicles, a division of
Natick Auto Sales, Inc.

[2]Forty other tax-paying residents of Massachusetts.

[3]The Department of State Police; Bonnell Motors, Inc.

[4]Natick Auto Sales, Inc. *vs.* Commonwealth of Massachusetts, Department
of Procurement and General Services, Department of State Police, Bonnell
Motors, Inc., and Adamson Industries, Inc.

626            47 Mass. App. Ct. 625 (1999)

Natick Auto Sales, Inc. *v.* Department of Procurement and General Services.

A motion to dismiss was heard by *Hiller B. Zobel*, J.

CIVIL ACTION commenced in the Superior Court Department on August 22, 1997.

A motion to dismiss was heard by *Issac Borenstein*, J., and a motion for summary judgment was heard by him.

*William S. Rogers, Jr.*, for the plaintiffs.

*F. Henry Ellis, III*, Assistant Attorney General, for the Department of Procurement and General Services & another.

*Ronald F. Kehoe* for Bonnell Motors, Inc.

*Peter G. Shaheen & Megan J. Taylor*, for Adamson Industries, Inc., submitted a brief.

KASS, J. AMI Municipal Vehicles, a division of Natick Motor Sales, Inc. (AMI), is aggrieved by not having been selected as the successful vendor in procurement conducted by the Commonwealth[5] in 1996 for a fleet of over 400 State police motor vehicles.[6] As to the Commonwealth, the questions that arise on appeal relate to the scope of relief available in a taxpayers' action under G. L. c. 29, § 63, and the preclusive effect of the taxpayers' action on a later action. As to the other defendants in the companion case, the questions on appeal have to do with whether their conduct was within the bounds of fair competition in the public bidding process.

Together with forty other taxpayers, AMI brought an action (AMI I) against the Commonwealth under G. L. c. 29, § 63, to enjoin performance of major parts of the bid award for the State police motor vehicle fleet. There were assertions of various bidding irregularities that disadvantaged AMI, notably evaluation of the light bar component for marked cruisers in a manner that favored a particular light bar, and, consequently, a particular motor vehicle vendor. The plaintiffs in AMI I were unsuccessful at the preliminary injunction stage and the action was thereafter dismissed. From that final order of dismissal, the taxpayers (AMI as the lead plaintiff) appealed. Not long after the filing on June 3, 1997, of the notice of appeal, AMI on August 22, 1997, initiated a second action (AMI II) against the Commonwealth. In that second action, AMI joined as defendants Bonnell Mo-

---

[5]The agencies that acted for the Commonwealth were the Department of Procurement and General Services and the Department of State Police.

[6]Bonnell Motors, Inc., the successful bidder, was allowed on motion to intervene in the Superior Court and has filed a brief in AMI's appeal from the judgment in the taxpayer action.

tors, Inc. (the successful bidder for marked State police cruisers, unmarked State police cruisers, and utility vehicles), and Adamson Industries, Inc. (the distributor of the light bar preferred by the cruiser selection board).[7] As to the Commonwealth, the claim in AMI II was that the Department of Procurement and General Services (DPGS)[8] had manipulated the bidding process in bad faith and that, therefore, AMI, a runner-up in the bidding contest, was entitled to its lost profits. See *Bradford & Bigelow, Inc.* v. *Commonwealth*, 24 Mass. App. Ct. 349, 359 (1987). Compare *Paul Sardella Constr. Co.* v. *Braintree Hous. Authy.*, 3 Mass. App. Ct. 326, 333 (1975), *S.C.*, 371 Mass. 235, 243 (1976). Against Bonnell Motors, Inc. (Bonnell), AMI claimed tortious interference with an advantageous business relationship, and a wilful and knowing violation of c. 93A. Claims similar in character, although different in detail, were lodged against Adamson Industries, Inc. (Adamson).

The appeal in AMI I was argued January 7, 1999. At argument, counsel made the panel aware of AMI II and that an appeal of the decision in that case was in the briefing stage. On January 12, 1999, the panel issued a notice that it had ordered consolidation of the two cases and that the same panel would consider AMI II along with the first case. Briefing was concluded in AMI II on March 22, 1999.

1. *Facts.* In December, 1996, DPGS, acting under G. L. c. 7, §§ 4A and 22, and regulations promulgated thereunder,[9] issued a request for response (RFR) that solicited proposals to sell to the Commonwealth, for the use of the State police, two alternative fuel vehicles; 200 marked cruisers; seventy full-size unmarked cruisers; five ramp trucks; two marked utility vehicles; and 200 mid-size unmarked cruisers. AMI bid on all categories save the mid-size cruisers and was successful in none. The claim of failure to adhere to bidding standards concentrates on the 200 marked cruisers. They carry light bars on their tops.

In the procurement process, the Commonwealth undertook to request responses on a performance standard basis, rather than specification of particular equipment. The procedures for this

---

[7] The cruiser selection board was made up of personnel from the Department of Procurement and General Services and from the State Police.

[8] DPGS is now called the Operational Services Division. See St. 1996, c. 151, § 35.

[9] See 801 Code Mass. Regs. §§ 21.00-21.09 (1996).

procurement process appear in 801 Code Mass. Regs. §§ 21.01-21.09 (1996). Before the RFR of December, 1996, DPGS had in November, 1996, made a request for information to vendors of light bar and siren controls. The State police formed a team, operating under the supervision of DPGS, to evaluate those components. This process resulted in the pre-approval of two light bar systems, the Whelen B-Link and the Federal Vista. At the time, AMI was the exclusive distributor in Massachusetts of the Whelen light bars and Adamson was a distributor of Federal light bars.

In pre-approving the Federal Vista light bar the State police did not give disqualifying effect to a failure by the manufacturer or distributor to meet a requirement that light bar proposals be supported by testing laboratory certification and references. Federal Signal Corporation (Federal), the manufacturer, had supplied that information for two of three models it offered, but not on the Vista model because it was new and had neither yet been tested nor used on a fleet basis. As to the Vista model, Federal wrote to the evaluation team that it expected to have the Vista bar laboratory tested in January, 1997, and, as to references, said it was currently providing Vista bars to similar users and offered to provide a list of those customers. The evaluation team had the bars themselves to examine. The laboratory certification and reference specifications were two of fifty-five specifications for the light bar evaluations. AMI urges that the submission of the Federal Vista light bar should have been rejected as nonresponsive, and, by extension, the proposal of Bonnell, which included the Federal Vista light bar, should have been rejected as nonresponsive.

AMI's second objection to the procurement process was that DPGS had postponed the deadline for submitting responses from January 6, 1997, to January 16, 1997, thereby "destroying the sanctity of the bidding process." The postponement had been the consequence of communications about the procurement process between AMI and Captain Thomas Maher, chairman of the State police cruiser selection board. After a preresponse meeting on December 20, 1996, between interested bidders and the cruiser selection board, AMI wrote a letter to Maher asking about certain selection criteria and how a point system for various elements of evaluation would be applied. Maher responded January 2, 1997, four days before the designated response deadline of January 6, 1997. When Kath-

leen A. Kennedy, the procurement director,[10] learned on January 6, 1997, that Maher had not distributed his written responses to AMI to any other bidders, she directed postponement of the bid deadline to January 16, 1997. She did so because a memorandum distributed to interested parties at the pre-bid meeting said that the agencies involved in the procurement process would disseminate all responses to any particular bidder to all potential bidders. During the ten days between January 6, 1997, and January 16, 1997, the responses received on January 6, 1997, were kept in quarantine. Bidders were permitted to amend their responses based on the additional information that had been disseminated to AMI.

A third category of grievance by AMI is that the cruiser selection board did not apply consistently the points that would be assigned to a bidder on the basis of the strength of the bidder's response as to mandatory equipment, product support documentation, references, and price. We shall set out facts that pertain to the complaints against Bonnell and Adamson when we discuss those aspects of the case.

2. *Disposition of the taxpayer action.* As noted, a judge of the Superior Court denied preliminary injunctive relief requested in AMI I, the action brought under G. L. c. 29, § 63. The judge determined that "[a]ny violations of the pertinent statutes or regulations were, at most, trivial and non-prejudicial," and, therefore, the plaintiffs did not have a substantial chance of success. *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 617-618 (1980). Thereafter, AMI I took an out of the ordinary turn. Even as AMI took steps, e.g., sought discovery, toward a trial on the merits, the Commonwealth moved successfully to stay discovery and then to dismiss the taxpayer action under Mass. R.Civ.P. 12(b)(6), 365 Mass. 755 (1974), for failure to state a claim for which relief can be granted. The judge, in a memorandum explaining his allowance of the motion, wrote: "[T]he sole relief provided by G. L. c. 29, § 63, is equitable in nature. Because this court has already denied injunctive relief, Plaintiff cannot proceed further under this statute." Denial of an application for a preliminary injunction is, however, a *preliminary* phase of an action for equitable relief and AMI plausibly argues on appeal that it was entitled to a trial on the

---

[10]Her full title at the time was procurement director for infrastructure and support in the operational services division of the Executive Office for Administration and Finance.

merits of its case for an injunction or at least the testing of factual allegations that accompanies proceedings on a motion for summary judgment. A motion under rule 12(b)(6) is for the failure of the complaint to state a claim for which relief can be granted. Such a motion does not lie unless, on the face of the pleading, the plaintiff's allegations, with all inferences drawn in the plaintiff's favor, do not state a set of facts which, if proved, would add up to a cause of action. *Nader* v. *Citron*, 372 Mass. 96, 98 (1977). *Blank* v. *Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 407 (1995). *Federico* v. *Brockton Credit Union*, 39 Mass. App. Ct. 57, 61 (1995). Read most favorably to the plaintiffs, the complaint in AMI I alleged deviations from bidding procedure that rigged the bidding in favor of the Federal Vista light bar and Bonnell.

Whatever the flaws, however, in the judgment of dismissal of AMI I, that case is now moot. As the judge correctly observed, under G. L. c. 29, § 63, the only relief available is injunctive relief.[11] By now, the cars have been delivered and have been in service for more than two years; they may be approaching the end of their useful lives. We pause to comment, however, on how a § 63 action may be carried on.

First, the Commonwealth has raised the point that the lawful subject of an action under § 63 is not a flawed procurement procedure, but something more fundamental, namely, a commitment of public funds to a purpose for which there is no statutory authorization or against which there is a constitutional prohibition. See, e.g., *Helmes* v. *Commonwealth*, 406 Mass. 873, 874 (1990) (claim, among others, that the public expenditure violated the anti-aid amendment, art. 18, as amended by arts. 46 and 103, of the Amendments to the Constitution of the Commonwealth). The cases do not support that contention. Use of § 63 to enjoin contract formation based on claims of flawed bidding procedure has been acknowledged for almost half a century. Violation of public bidding statutes has been viewed as

---

[11]The statute, inserted by St. 1937, c. 157, provides: "If a department . . . of the [C]ommonwealth is about to expend money or incur obligations purporting to bind the [C]ommonwealth . . . in any manner other than that for and in which such department . . . has the legal and constitutional right and power to expend money or incur obligations, the supreme judicial court or superior court may, upon the petition of not less than twenty-four taxable inhabitants of the [C]ommonwealth, not more than six of whom shall be from any one county, determine the same in equity, and may, before the final determination of the cause, restrain the unlawful exercise or abuse of such right and power."

a sufficient injury to the public interest to justify use of a taxpayers' action as the instrument of challenge. See *Gifford* v. *Commissioner of Pub. Health*, 328 Mass. 608, 611 (1952); *East Side Constr. Co.* v. *Adams*, 329 Mass. 347, 348-349 (1952) (action brought under G. L. c. 40, § 53, an analogous taxpayer action statute for use against municipalities); *Edwards* v. *Boston*, 408 Mass. 643, 644-646 (1990). Cf. *Helmes* v. *Commonwealth*, *supra* at 874.

In its use of § 63, however, AMI made strategic choices which ultimately have consequences for its claims in AMI II. As the cases cited in the preceding paragraph illustrate, taxpayer actions have commonly been yoked with additional counts or simultaneous companion cases in which the disappointed bidder asks for injunctive relief in its own right, as well as damages. The varying aspects of the controversy, which are grounded in common facts to be proved, can then be disposed of in a single proceeding. AMI suggests that a claim for damages was implicit in a general prayer in the complaint in AMI I for "such further relief as the Court deems just and proper under the circumstances." Section 63, however, does not provide for an award of damages to the public; rather, the statute aims at avoiding unlawful expenditure of public money. A judge is entitled to consider a case as it is presented. Cf. *Arizonans for Official English* v. *Arizona*, 520 U.S. 43, 73 (1997).

There is in bid contest cases a tension between public business not being obstructed by cavils and getting the facts and law sorted out to the end that procurement procedures are not ignored or manipulated. It is commonly the fact, as the judge in AMI I observed, that if injunctive relief is the object, and an application for a preliminary injunction has been denied, the train will have left the station and further inquiry into the case will not accomplish anything. That is not always the case, however, because in some procurement situations, performance will be in stages, and equitable relief may not be toothless. Indeed, this may have been such a case because the vehicles were not going to be delivered the next day nor necessarily all at once. See, e.g., *Boston Harbor Commuter Serv., Inc.* v. *Massachusetts Bay Transp. Authy.*, 46 Mass. App. Ct. 122, 124 (1999). Moreover, if a court determines on the more searching examination of the merits inherent in a trial that there has been a material violation of procurement procedures, the circumstance of inconvenience and cost to the awarding agency (and,

derivatively, the public) does not necessarily preclude injunctive relief.

Any trial as to permanent injunctive relief is not likely to be useful in the procurement context unless it moves with great expedition. For that end there is a means in Mass.R.Civ.P. 65(b)(2), 365 Mass. 833 (1974), which provides that:

> "Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application."

For discussion of the circumstances in which consolidation under Rule 65(b)(2) may be appropriate, see *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. at 616 n.10; *Metropolitan Dist. Commn. V. Codex Corp.*, 395 Mass. 522, 524-525 (1985); *Harris* v. *Commissioner of Correction*, 409 Mass. 472, 474-475 (1991). AMI made no request for consolidation under rule 65(b)(2).

3. *Disposition of AMI II.* (a) *As against the defendant Commonwealth.* On the Commonwealth's motion, a second judge of the Superior Court dismissed the action for damages against the Commonwealth in AMI II on the ground of the pendency of the appeal of the prior action, AMI I. See Mass.R.Civ.P. 12(b)(9), 365 Mass. 755 (1974). AMI protested that *it* did not have a prior action pending. In AMI I, its capacity as a plaintiff was as a taxpayer, a representative capacity, whereas in AMI II, it was a plaintiff on its own account. For that distinction, see *Rudow* v. *Fogel*, 376 Mass. 587, 589-590 (1978). We think the judge was right that in this case the taxpayer status of AMI was a fig leaf and that AMI was the real party in interest. It was AMI that wanted to stop the award to Bonnell, and a taxpayer action was the device it chose so to do. As the judge observed in his memorandum of decision, the other forty taxpayers in the taxpayer action were employees of AMI.

The two actions launched by AMI are an example of claim splitting, warranting invocation of the doctrine of claim preclusion. As noted, claims for damage could have been added on behalf of AMI in its own right either as a separate count in AMI I or in a simultaneous complaint consolidated with the taxpayer complaint. Failure to do so requires the Commonwealth to defend twice the same claim of wrongdoing (violation of its

procurement procedure) and requires the court to hear that claim twice, a misapplication of scarce judicial resources. See *Bagley* v. *Moxley*, 407 Mass. 633, 636-637 (1990); *Boyd* v. *Jamaica Plain Co-op. Bank*, 7 Mass. App. Ct. 153, 155-158 & n.8 (1979).

The claim against the Commonwealth in AMI II was rightly dismissed.

(b) *As against the defendant Adamson.* AMI's claim against Adamson went down on summary judgment by application of the principles enunciated in *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 317, 322-324 (1986), and *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991), namely that the party opposing summary judgment (AMI) had "no reasonable expectation of proving an essential element of that party's case." As to tortious interference with advantageous commercial relations, there was no relationship between AMI and the Commonwealth other than responder to a procurement request. Adamson and AMI were direct competitors in selling the light bar component and anything that Adamson may have done to bring the prize home was a proper motive, not an improper motive. *Doliner* v. *Brown*, 21 Mass. App. Ct. 692, 695 (1986). *Schwanbeck* v. *Federal-Mogul Corp.*, 31 Mass. App. Ct. 390, 412-413 (1991), *S.C.*, 412 Mass. 703, 710 (1992) ("Competing for the prize is within the realm of permissible interference"). The allegation in AMI's complaint against Adamson is that it denied AMI a discount on light bars that it gave to Bonnell. The claim of discount did not go beyond allegation. The only evidence in the summary judgment materials about price quotes for the Federal light bars to another bidder on marked cruisers shows the same quote given by Adamson to AMI. There is no evidence of a better price to Bonnell, although as Adamson and Bonnell had a commercial relationship a better price to Bonnell would not have been unreasonable. AMI's charges of collusion between Adamson and Bonnell were, as the motion judge remarked, "conclusory and wholly unsupported." One may ask, why should a supplier of a component and the prime vendor not discuss how the vendor might make the most competitive bid? There is no showing in the record that AMI had a reasonable expectation of proving either improper motive or improper means in Adamson's conduct. *Swanset Dev. Corp.* v. *Taunton*, 423 Mass. 390, 397 (1996). *W. Oliver Tripp Co.* v. *American Hoechst Corp.*, 34 Mass. App. Ct. 744, 751-752 (1993). Restatement (Second) of Torts § 768 (1977).

AMI charges Adamson with having misrepresented that it would offer no discounts. First, there is no evidence that Adamson did give Bonnell a discount. Second, Adamson's response to AMI about discounts was guarded and understandably so as AMI was the exclusive distributor of the competing light bar assembly. Adamson owed AMI no helpful information about how AMI should price its competing product.

AMI's claim under c. 93A rode piggy-back on the tort claims and fails along with them. The record shows no more than typical competitive behavior.

(c) *As against the defendant Bonnell.* In all material respects the counts in AMI II are a mirror image of the counts against Adamson. We need not repeat the discussion of those claims. There are a few additional matters but they are equally without merit and were largely echoes of AMI I, in which Bonnell had become a party as an intervener. The Superior Court judge disposed of the counts against Bonnell on a motion for judgment on the pleadings. Mass.R.Civ.P. 12(c), 365 Mass. 756 (1974). Bonnell had also moved for summary judgment. There was solid ground for disposition of the case on the latter basis. See *Foley* v. *Lowell Sun Publishing Co.*, 404 Mass. 9, 10-11 (1989) (appellate court can affirm on basis different from that relied upon by trial court judge); *Doeblin* v. *Tinkham Dev. Corp.*, 7 Mass. App. Ct. 720, 722 (1979).

The judgment in Middlesex Superior Court civil action 97-1009 is affirmed. The judgment in Middlesex Superior Court civil action 97-4392 is affirmed.

*So ordered.*