van Gestel,
J. This matter is before the Court on two motions for summary judgment: one by the Boston Redevelopment Authority and its Director, Mark Maloney (collectively the “BRA”); and the other by Thomas M. Menino, individually and as Mayor of the City of Boston (“the Mayor”). The plaintiffs, the South Boston Betterment Trust Corporation (“SBBT’j and James M. Kelly, in his capacity as District 2 City Councilor (“Councilor Kelly”), oppose both motions in essentially all respects.

BACKGROUND

Before reciting the material facts upon which this decision is based, the Court comments on two other background points or issues.
The first point relates to the capacity in which Councilor Kelly is acting in all matters relating to the situation in litigation. What is involved is a Memorandum of Understanding (“MOU”) executed on March 11, 1998. There were two identical versions of the MOU executed by Councilor Kelly: one is recited to have been executed “in his capacity as District City Councilor, District 2"; and the other is recited to have been executed by him ’’Individually."
The First Amended Verified Complaint (hereafter the “complaint”), filed on April 13, 2001, which is the only complaint presently governing the plaintiffs’ case, includes only the version of the MOU signed by Councilor Kelly in his official City Councilor capacity. Further, all allegations that mention the subject in the complaint speak only to his acting in his official capacity. Also, upon questioning by the Court at oral argument, counsel for both plaintiffs affirmed that Councilor Kelly was acting in his official capacity, not individually, when he executed and acted pursuant to the MOU.
The Court, therefore, accepts all of the foregoing and only will address the issues before it on the assumption that Councilor Kelly acted always in the official capacity of a City Councilor.[1]
The second preliminary point relates to the claims against the Mayor in his personal capacity. It was stated by counsel for the SBBT that he has assured counsel for the Mayor that the plaintiffs are seeking no monetary relief from the Mayor personally, except for such as the Mayor may have a right to indemnification from the City. This Court, however, is governed by the pleadings before it. Thus, until the complaint is in some way amended to reflect this assurance, the Court can only assume that all relief available against the Mayor is still in issue.
The Court now turns to the plaintiffs’ complaint, from which it will recite the material facts upon which this decision is grounded.
As noted above, on March 11, 1998, the MOU was executed. A complete copy of the MOU is attached to the complaint as Exhibit A. The parties to the MOU are, on the one hand, the BRA, and on the other hand, Councilor Kelly in his capacity as District City Councilor, District 2, Stephen F. Lynch (“Senator Lynch”), “in his capacity as State Senator, 1st Suffolk District,” and John A. Hart (“Representative Hart”), “in his capacity as State Representative, 4th Suffolk District.” Councilor Kelly, Representative Hart and Senator Lynch are sometimes collectively referred to in the complaint as the “Representatives” or the “Elected Officials.” This Court will do so here as well.
The Elected Officials are all residents of the South Boston District, and their respective legislative districts, although covering other areas as well, include South Boston in parts thereof.
The MOU was executed with full knowledge of and, it seems, under the urging, if not the express directives, of the Mayor. Its purpose, generally, relates to the handling of benefits to the residents of South Boston in connection with the future development in the nearby Seaport District.
*88 One of the most significant projects to be developed in the Seaport District is the financing and construction of a new convention and exhibition center (the “Convention Center”). This project was authorized pursuant to Chapter 152of the Acts of 1997 (the “Act”). Section 13(a)(1) of the Act required that by March 11, 1998, the Boston City Council was to vote on (1) whether to approve the Convention Center project, and (2) to authorize indebtedness or appropriate sums in an aggregate amount not exceeding $157,800,000 for the project.
The MOU acknowledges that the neighborhood of South Boston will be the neighborhood most impacted by development in the Seaport District.
The MOU then describes ways in which the BRA and the Elected Officials intend to cooperate and to coordinate their joint efforts with regard to the provision of benefits for the residents of South Boston in connection with the future development. The kinds of items dealt with, called “community benefits,” include linkage payments, employment and job training, affordable housing, and zoning and design issues.
The eighth “Whereas” clause of the MOU reads in material part:
[T]he parties hereto have deemed it to be in the public interest that there shall be established a charitable organization to be known as the South Boston Betterment Trust (the “Trust”) pursuant to Massachusetts General Laws c. 180 and Section 501(c)(3) of the Internal Revenue Code, the directors of which shall be residents of South Boston (including but not limited to its elected officials and other neighborhood leaders), selected by such officials and leaders, which Trust shall, in perpetuity, be the beneficiary of community benefits established pursuant to this MOU or to any agreements related to the development in the Seaport District.
Section 5.2 of the MOU reads:
This MOU is a legally binding document having the full force and effect of the law between the parties and their successors in office, assignees and agents, and shall be enforceable by the signatories hereto in a court of law by equitable relief, but shall create no rights hereunder in any party not a signatory hereto.
The MOU, in Section 5.3, is said to be governed by the laws of Massachusetts.
Section 5.5 recites that the “MOU sets forth the entire agreement of the parties hereto with respect to the subject matter contained herein ...”
On the same day of the signing of the MOU, and inferentially because of that signing, the Boston City Council voted unanimously to approve the Convention Center project.
About a year later, the SBBT was established, and its trustees were appointed. Three of those trustees were appointed by the Mayor.
For a period of time thereafter at least until May 24, 2000, the parties to the MOU, as well as others in city government — including, in particular, the Mayor— acted in all essential respects in a manner consistent with the terms and conditions of the MOU. Although not described in the complaint but well featured in the filings regarding these motions, on May 24, 2000, The Boston Globe (the “Globe”) published a lengthy article that was highly critical of the MOU and the actions being taken pursuant thereto. Essentially, the Globe accused the SBBT and Councilor Kelly of being overly aggressive in their activities with developers and criticized the Mayor for not policing the situation and for agreeing that far too much linkage money would go to South Boston, as opposed to other parts of the City.[2]
Essentially, from the time of the May 2000 Globe article, the plaintiffs allege that the Mayor and other City employees under his direction and control took actions to scuttle the MOU and the activities of the SBBT pursuant thereto. They point most directly to two letters, each dated June 1, 2000, from the Mayor. The letters are attached to the complaint as Exhibit C and Exhibit D. Exhibit C was addressed to “Dear Developer,” and Exhibit D was addressed to "Dear Councilor Kelly.” The letters in their entirety are available as part of the complaint. The Court quotes here, however, from the portion of Exhibit C that is included in para. 84 of the complaint, the plaintiffs there calling it an “overt interference with the Plaintiffs' contractual and prospective advantageous relationships.” The excerpt from the letter reads:
[I]t was never the intent of this Administration to assign all community benefits to a charitable corporation that allows its trustees and officers to have personal interests — including financial — in the affairs of the corporation. Public money is not to be used for private gain. Therefore, it is inappropriate for the Betterment Trust to be the pre-designated receiver of community benefits for South Boston . . . [D]o not enter into any agreements without the City’s approval. . .
Earlier in the letter, the Mayor said:
So let me spell this out in clear English — any agreement that is made without the involvement and approval of the City will have no legal bearing on the City’s approval of a pending project. I will not allow any side deals that enrich one entity to the detriment of others, or the public interest.
Both Exhibit C and Exhibit D are on official City of Boston letterhead for the “OFFICE OF THE MAYOR, ” and both are signed “Thomas M. Menino, Mayor of Boston.”
It is with the foregoing undisputed factual background that, on September 12, 2000, the original complaint in this action was filed. The current complaint, as amended, contains seven separate counts, as follows: Count I, seeking a declaratory judgment that the MOU is a valid, binding and enforceable contract; Count II, against the BRA, for breach of contract and the implied covenant of good faith and *89 fair dealing, the contract being the MOU; Count III, against Thomas M. Menino personally for wrongful interference with the MOU; Count IV, against Thomas M. Menino individually for wrongfully interfering with the SBBT’s contractual and prospective advantageous relationships; Count V, against the BRA and the Mayor for fraudulently inducing the parties to sign the MOU; Count VI, for specific performance of the MOU; and Count VII, for injunctive relief against the Mayor and employees of the BRA, preventing them from interfering with the plaintiffs’ rights under the MOU.

DISCUSSION

This matter is highly charged politically. The role of the Court, however, is not to inflame the passions of the politicians or take sides in the overall debate. Rather, the Court must examine the law that applies, including the limitations on its own powers to act.
Count I of the complaint is the basic foundation upon which almost everything else rests. In their own words, “(t]he Plaintiffs seek a declaration that the MOU is a valid, binding and enforceable contract.” The response to that count will go far toward resolving the issues raised by the six counts that follow.
Summary judgment “shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Mass.R.Civ.P. Rule 56(c).
Further, at the outset of this discussion, the Court notes its full awareness of Judge Fahey’s March 2, 2001 memorandum of decision and order on the defendants’ motion to dismiss the original complaint. Judge Fahey, of course, was dealing with a motion to dismiss and the much different criteria thereunder for assessing the validity of the complaint. A Rule 12(b)(6) motion admits all well-pleaded allegations of the complaint, and the Court must accept as true such inferences as may be drawn in the plaintiffs’ favor. Natick Auto Sales, Inc. v. Department of Procurement and General Services, 47 Mass.App.Ct. 625, 630 (1999). Of course, conclusions of law from the facts alleged are open for review on a Rule 12(b)(6) motion. The complaint before Judge Fahey had to be deemed sufficient unless it showed beyond doubt that no provable set of facts would entitle the plaintiffs to relief. Harvard Law School Coalition for Civil Rights v. President & Fellows of Harvard College, 413 Mass. 66, 68 (1992). The plaintiffs, at that time, bore a “relatively light burden,” Warner-Lambert Co. v. Execuquest Corp., 427 Mass. 46, 47 (1998), and had to be given the benefit of any doubts. Kipp v. Keuker, 7 Mass.App.Ct. 206, 210 (1979). These are “generous principles,” and Judge Fahey applied them in the way they were intended. Connerty v. Metropolitan District Commission, 398 Mass. 140, 143 (1986). In the process however, she herself observed that a “different conclusion may well be reached on summary judgment.”
This Court will attempt to avoid plowing again the ground so well cultivated by Judge Fahey. She decided the issues about there being a lack of consideration for the MOU; Judge Fahey addressed the contention that Councilor Kelly had no capacity to contract because of the limitations imposed by St. 1951, c. 376 and the Boston City Charter; and she dealt with arguments that the MOU violated certain State and local laws: G.L.c. 121B; St. 1956, c. 665; St. 1987, c. 371; St. 1997, c. 152; and Art. 80 of the Boston Zoning Code. This Court will not consider those positions again on the present motions.
Judge Fahey appears to have considered each of the issues before her principally by applying regular and well-settled principles of contract law. Those'legal principles seem to have been what the lawyers raised in their arguments before her then. The MOU, however, is not an ordinary contract. This Court, therefore, must begin at a more fundamental jurisprudential position.
The signatories and parties to the MOU are the BRA, a municipal planning and development agency in the executive branch of the government of the City of Boston, and a State Senator, a State Representative and a City Councilor, each of the latter being elected governmental officials purporting to act in their official capacities. The official functions of the Senator, Representative and Councilor are purely legislative. See, e.g., Opinion of the Justices, 303 Mass. 615, 623-24 (1939). It could well be illegal for any of the elected officials to act in connection with the MOU in any way other than in their official capacities. See, e.g., Charbonnier v. Amico, 367 Mass. 146, 151 (1975); Conley v Ipswich, 352 Mass. 201, 203-05 (1967); Clove Hill Hospital v. Lawrence, 315 Mass. 284, 285 (1994).
Thus, an agency of the executive branch of government purported to enter into a contract with three members of different legislative branches acting in their official capacities, and one of the parties[3] now asks a member of the judicial branch — this Court — to declare the document’s validity as a contract and to specifically enforce it. The Declaration of Rights of the Massachusetts Constitution does not permit this Court to do what is asked of it. Part 1, art. 30 reads:
In the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: the executive shall never exercise the legislative and the judicial powers, or either of them: the judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men.
What cannot be tolerated is the interference by one department of government with the powers of another department. New Bedford Standard-Times Pub. Co. v. Clerk of the Third District Court of Bristol, 377 Mass. 404, 409-10 (1974); Opinion of the Justices to the Senate, 375 Mass. 795, 813 (1978); Opinion of the Justices, 365 Mass. 639, 640-42 (1974).
*90 “(T]he prohibitions of art. 30 [governing the separation of powers] cannot be evaded by agreement between one branch of government and another.” Brach v. Chief Justice of the District Court Department, 386 Mass. 528, 537 (1982). The provisions in the MOU whereby the parties declare it to be “a legally binding document having the full force and effect of the law . . . and . . . enforceable ... in a court of law by equitable relief’ run contrary to the prohibitions of art. 30. It cannot be “a government of laws and not of men” if men by their simply saying so can avoid the separation of powers imposed by the constitution.
Enforcement of the MOU is not “a purely judicial function” and, therefore, it would “violate the principle of separation of powers” to do so. See, e.g., Attorney General v. Sheriff of Suffolk Cty., 394 Mass. 624, 631 (1985).
“Where a court contemplates an injunctive order to compel an executive agency to take specific steps, it must tread cautiously in order to safeguard the separation of powers mandated by art. 30 of the Declaration of Rights of the Massachusetts Constitution.” Smith v. Commissioner of Transitional Assistance, 431 Mass. 638, 651 (2000). A Court cannot constitutionally direct the administration of a city department where such administration involves the exercise of discretion, see Stretch v. Timilty, 309 Mass. 267, 270-71 (1941), or require such a department to do something that the law does not mandate. See Charrier v. Charrier, 416 Mass. 105, 110 (1993). Even a cursory examination of the MOU will reveal that there is an extensive degree of discretion to be exercised by the BRA in carrying out its statutory duties and the requirements included on the matters encompassed in the MOU, and there is nothing in the law that mandates the BRA to do what the MOU would compel.
This Court cannot specifically enforce the MOU. The parties are involved in a truly political situation, carefully circumscribed and guarded by the separation of powers constraints of the Massachusetts Declaration of Rights. The MOU, therefore, is not binding as a contract because constitutionally it cannot be enforced by a court of law. See, e.g.,Lord v. Winchester, 355 Mass. 788 (1969); Potter & McArthur, Inc. v. City of Boston, 15 Mass.App.Ct. 454, 459-60 (1983). “In the absence of constitutional or statutory violations, the remedy for unwise policy choices is not judicial intervention but the ballot box.” Citywide Parents Council, Inc. v. School Committee of Boston, 27 Mass.App.Ct. 739, 743 (1989).
There are additional problems with the MOU insofar as the Elected Officials who signed it are acting in their official capacities. The Court will address only Councilor Kelly since he is the only signatory Elected Official who appears as a plaintiff in this case, but the law is the same for Senator Lynch and Representative Hart. In what official capacity was Councilor Kelly acting when he signed the MOU? He certainly was not acting as an agent for the City Council; he was acting alone,[4] not with the authority of a City Council vote. The City Council, in any event, is not an entity or body that has identity apart from that as the legslative branch of the City of Boston. It cannot sue or be sued, Latino Political Action Committee, Inc. v. City of Boston, 581 F.Sup. 478, 484 (D.Mass. 1984), nor can it enter into a contract such as that here. Councilor Kelly has no official powers greater than the City Council on which he sits. Nor can Councilor Kelly, without violating G.L.c. 268A, Sec. 17(c), have acted in his official capacity as an agent for anyone — e.g., the SBBT — in connection with any particular matter in which the City has a direct and substantial interest.[5] A municipal employee cannot act on behalf of a municipality and simultaneously on behalf of a private party in the same matter without violating c. 268A, Sec. 17(c), even where the interests of the two are not adverse. Town of Edgartown v. State Ethics Commission, 391 Mass. 83, 88 (1984).
If the MOU is not a binding and enforceable contract, then the SBBT cannot be an intended beneficiary thereof. Without such status, the SBBT has no standing here.
To paraphrase the words of Justice Wilkins in Phipps Products Corp. v. Massachusetts Bay Transportation Authority, 387 Mass. 687, 694 (1982), "[a]Ithough the [Mayor’s] conduct would hardly qualify [him] for a ‘sportsmanship’ award and although [the SBBT] may reasonably conclude that it was treated most unfairly, a decision in [the plaintiffs’] favor would seriously threaten the integrity of the [separation of powers clause of art. 30 of the Declaration of Rights].”
For the foregoing reasons Count I cannot survive. Further, with the MOU not being a binding and enforceable agreement, Counts II, III, VI and VII cannot survive either.
Counts III and IV are said to be brought against the Mayor in his non-official, personal, capacity. "The Complaint does not assert a damage claim against the Mayor in his ‘official capacity’ but only in his individual capacity ...” Plaintiffs’ Opposition to Mayor Menino’s Motion for Summary Judgment at p. 16. Count III charges wrongful interference with the MOU. Since the MOU is not a binding and enforceable agreement, whatever the Mayor’s actions may have been concerning it, official or individual, cannot be found to be wrongful interference with a contract in the legal sense.
Further, as to both Counts III and IV, the extensive allegations proffered by the plaintiffs in their filings make clear and the undisputed facts reveal that the Mayor always was acting in his official capacity. The June 1, 2001 letters, on their face, are the acts of the Mayor as mayor. They would have no other significance or meaning if they were not. Thomas M. Menino, a man who lives in Hyde Park, does not, as an ordinary citizen, have an “Administration” to speak for as the Mayor did in those letters, nor does he, as just a man from Hyde Park, have any power to do any of the things those letters speak to. Similarly, the lengthy recitation by the plaintiffs of the many things they accuse the Mayor of having done *91 were all actions taken in his capacity as the Mayor, not the acts of an ordinary man from Hyde Park.
When acting in his official capacity, the Mayor enjoys immunity from liability on claims arising out of his discretionary actions within the scope of his authority for legitimate government purposes. See G.L.c. 258, Sec. 10(b). See also Gildea v. Ellershaw, 363 Mass. 800, 816 (1973). The complaint does not, as counsel for the SBBT inferred, charge Thomas M. Menino, either as the Mayor, or as just a man from Hyde Park, with any “constitutional tort.”
Thus, there are no viable claims against the Mayor in his individual capacity, and both the applicable law and the plaintiffs’ own disclaimer make clear that there are no valid claims against him in his official capacity. Counts III and IV cannot stand.
Count V charges the Mayor and employees of the BRA with fraudulently inducing “the plaintiffs” into executing the MOU. It is hard to believe that the plaintiffs are serious about these charges. In the first place, the Articles of Organization of the SBBT were not even filed until April 23, 1999, more than a year after the MOU was signed, and it never executed the MOU. The SBBT, therefore, cannot claim that it was fraudulently induced to do so.
The only other plaintiff is Councilor Kelly, a man who, to use the words he chose to describe himself in his own affidavit, is “thoroughly familiar with the operations of city government,” is “competitive,” and is “a good negotiator" who ”drive[s] a hard bargain.” Does Councilor Kelly really want or expect this Court to rule that this was a document that he was duped into signing? It is, after all, an instrument about which he argues forcefully that the Mayor, the BRA and everyone else abided by and acted consistently with from March of 1998 until the Globe article appeared in May of2000 and turned up the political heat. Councilor Kelly was not fraudulently induced. to enter into the MOU, and he presents no convincing argument in his opposition that he was. Rather, the real thrust of Councilor Kelly’s case is that the MOU is a valid, binding and enforceable agreement, not one that failed because of a fraud in the inducement and from which he, or anyone else, should be excused from honoring.
Count V has no merit on the facts presented by the plaintiffs in their own complaint.
The Court next addresses the Rule 56(f) contentions by the plaintiffs. As can be seen from the foregoing discussion, this Court has acted principally upon constitutional and statutory provisions based upon undisputed facts and documents. Those facts and documents cannot be enhanced or changed by the kinds of discovery sought. The Court made no judgments based upon the facts of what the plaintiffs claim the Mayor did or did not do pursuant to or in contravention of the MOU. If those facts were to be a part of the analysis, the motions would be denied because many, if not most, clearly are in dispute. They did not, however, form any part of the basis for this decision, and therefore no Rule 56(f) depositions are warranted.
Lastly, the defendants seek to have the affidavits of Councilor Kelly and Maryann McLeod Crush stricken as being improperly based on rank hearsay and speculation. That they may be, but as with the plaintiffs’ Rule 56(f) issues, this Court did not utilize anything other than the documents attached to those affidavits, and Councilor Kelly’S assertions therein about his political prowess, in reaching its conclusions. Consequently, it declines to act on the motion to strike.

ORDER

For the reasons stated above, the motion for summary judgment of the Boston Redevelopment Authority and Mark Maloney, and the similar motion of Mayor Thomas M. Menino, both individually and officially, are ALLOWED. The First Amended Verified Complaint shall be dismissed.

Among other things, this obviates the necessity to address the implications of G.L.c. 268A on the actions of a municipal employee, acting in his individual capacity, as a party to a contract with an agency of the City by which he is employed. There remain open, however, issues relating to those portions of c. 268A that regulate municipal and other governmental employees acting in their official capacities.

By this recitation the Court intends no approval of, nor does it give any credence to, the various allegations in the Globe story. The fact of the article, however, looms large in the political background that followed.

Senator Lynch and Representative Hart did not join Councilor Kelly as parties plaintiff in this case.

Councilor Kelly says as much in the plaintiffs’ memorandum in opposition at pp. 27-28.

He may also face serious issues because of the proscriptions of G.L.c. 268A, Sec. 23(b). Councilor Kelly, of course, denies acting as an agent for the SBBT at p. 32 of the plaintiffs’ opposition memorandum.