van Gestel, J.
This matter is before the Court on a motion pursuant to Mass.R.Civ.P. Rule 12(b)(6) by the. third-party defendant, Essex Group, Inc. (“Essex”), to dismiss the third-party complaint of the defendant, United Technologies Corporation (“UTC”).

BACKGROUND

The third-party complaint was docketed as Paper #6 on November 27, 2001. It includes the following material allegations.
The plaintiff, Liberty Mutual Insurance Company (“Liberty”), is a mutual insurance company organized pursuant to the laws of Massachusetts.
*627 UTC is a Delaware corporation that regularly transacts business in Massachusetts.
Essex is a Michigan corporation that regularly transacts business in Massachusetts.
Liberty’s complaint against UTC alleges that UTC breached its insurance contracts with Liberty (the “Liberty Policies”) by refusing to pay the net final premiums that are allegedly due thereunder. The Liberty complaint is attached to the third-party complaint as Exhibit A.
In its third-party complaint, UTC alleges that the Liberty complaint alleges that-under the terms of the Liberty Policies, the final premiums for each of the policy coverage periods that are the subject of this dispute were to be calculated pursuant to a retrospective rating premium endorsement.
UTC further alleges that the Liberty Policies concern insurance coverage for workers’ compensation, general liability and automobile liability “to UTC and its ‘Named Insureds’ for the period from October 1, 1975 through October 1, 1986.”
During the period that is covered by the Liberty Policies — October 1, 1975 through October 1, 1986— Essex was a subsidiary of UTC and was a “Named Insured” under the Liberty Policies. During this same period, Essex was engaged in operations that posed long-term general liability, automobile liability, and workers’ compensation risks and brought numerous claims under the Liberty Policies.
On January 15, 1988, UTC, Essex, and MS/Essex Holdings, Inc. entered into a stock purchase agreement whereby MS/Essex Holdings, Inc. purchased the stock of Essex, and Essex ceased to be a subsidiary of UTC (the “UTC/Essex Agreement”).
UTC alleges that the UTC/Essex Agreement provided that Essex could continue to make claims under the Liberty Policies with the condition that Essex would be bound by the terms and conditions of the underlying Liberty Policies. UTC bases this allegation on Paragraph 5.16 of the UTC/Essex Agreement, which it quotes in Paragraph 10 of its third-party complaint as stating:
Insurance. Seller [UTC] expressly recognizes the right of Buyer [MS/Essex Holdings, Inc.] and the Company [Essex] to make claims for coverage under the Seller’s [UTC’s] insurance policies after the Closing with respect to any events occurring prior to the Closing for which coverage is provided to the Company [Essex] under the terms and conditions of such policies.
UTC then alleges that Paragraph 5.16 of the UTC/Essex Agreement placed Essex in the shoes of UTC in the event that Essex decided to bring claims under the Liberty Policies.[1]
After the closing of the UTC/Essex Agreement, Essex brought numerous claims under the Liberty Policies and, UTC believes, was provided with insurance coverage.
Liberty’s complaint alleges that Liberty is due from UTC the net final premiums that were incurred as a result of the insurance coverage Liberty provided under the Liberty Policies. UTC, in its third-party complaint, “states that if, in fact, Liberty is due final net premiums under the Liberty Policies, then Essex, as the party that brought the claims and received the insurance coverage, is liable for payment of said premiums,” and that Essex has failed, refused, and neglected to pay those premiums.
UTC’s third-party complaint then sets forth five counts, each incorporating the foregoing allegations, and thereby charges Essex with: breach of contract— Count I; indemnification — Count II; contribution— Count III; unjust enrichment — Count IV; and seeks a declaratory judgment — Count V.
In support of its motion to dismiss, Essex has filed the affidavit of Jerome T. Chalwick, who is described therein as “the acting Assistant Secretary of Essex Group, Inc.” All that the Chalwick affidavit does is attest to the accuracy of and enclose a copy of the UTC/Essex Agreement and a table of contents referring to the Agreement and “related documents.”[2]

DISCUSSION

At the outset of this discussion, the Court observes that it is concurrently considering the merits of a motion for partial summary judgment under Mass.R.Civ.P. Rule 56 filed by Liberty on all but one count of its complaint against UTC and a portion of UTC’s counterclaim. The resolution of the Rule 56 motion will primarily be grounded on an interpretation of the Liberty Policies. By contrast, resolution of the Rule 12(b)(6) motion under consideration here will be grounded on an interpretation of the UTC/Essex Agreement.
A Rule 12(b)(6) motion admits all well-pleaded allegations of the third-party complaint, and the Court must accept as true such inferences as may be drawn in the third-party plaintiffs favor. Natick Auto Sales, Inc. v. Department of Procurement and General Services, 47 Mass.App.Ct. 625, 630 (1999). Of course, conclusions of law from the facts alleged are open for review on a Rule 12(b)(6) motion. The third-party complaint here, however, will be considered sufficient to survive under Rule 12(b)(6) unless it shows beyond doubt that no provable set of facts would entitle UTC, the third-party plaintiff, to relief. Harvard Law School Coalition for Civil Rights v. President & Fellows of Harvard College, 413 Mass. 66, 68 (1992). UTC bears a “relatively light burden,” Warner-Lambert Co. v. Execuquest Corp., 427 Mass. 46, 47 (1998), and must be given the benefit of any doubts. Kipp v. Keuker, 7 Mass.App.Ct. 206, 210 (1979). These are “generous principles,” and the Court will apply them in the way *628 they are intended. Connerty v. Metropolitan District Commission, 398 Mass. 140, 143 (1986).
Paragraph 10.3 of the UTC/Essex Agreement is a full and complete integration clause. Nothing outside of the Agreement need be, or should be, considered in its interpretation. Further, by Paragraph 10.12, the Agreement “shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the principles of choice of law thereof.”
UTC, MS/Essex Holdings, Inc. and Essex are all highly sophisticated entities. Further, it appears from the UTC/Essex Agreement that UTC, the seller, was represented in connection therewith by the New York law firm Wachtell, Lipton, Rosen & Katz; and MS/Essex Holdings, Inc., the buyer, by the New York law firm Skadden, Arps, Slate, Meagher & Flom. Both law firms are recognized as exceptionally well skilled in matters of the nature of the transaction. To conclude that UTC and Essex were lacking in sophistication or were neophytes in their respective businesses or that they, and their eminent counsel, were not knowledgeable about matters relating to contracts and their implications — particularly the UTC/Essex Agreement — would be a misstatement of gigantic proportion.
Here — perhaps more than in situations in which there is a disparity in bargaining power or a general lack of sophistication about the matter at hand— where knowledgeable and fully represented parties chose to embody their relationship in a detailed and carefully crafted written instrument, they are entitled to and should be held to the language they chose. The Court should be careful not to impose its own views on the contracting parties or to let matters outside the four comers of the instrument that are specifically anticipated and addressed therein overwhelm or change the document itself. “Courts cannot. . . [, for example,] use commercial context to override express provisions of a contract.” Plymouth Rubber Co. Inc. v. Insurance Company of North America, Inc., 18 Mass.App.Ct. 364, 369 (1984).
The New York law that applies to the UTC/Essex Agreement is not significantly different from that of Massachusetts. In cases of contract interpretation, the words and phrases used by the parties are to be afforded their “plain meaning.” Brooke Group, Ltd. v. JCH Syndicate 488, 87 N.Y.2d 530, 534 (1996). New York courts, like those in Massachusetts, have a long history of refusing, under the guise of judicial construction, to imply additional unstated obligations into contracts. See, e.g., Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 85 N.Y.2d 173, 182 (1995).
The UTC/Essex Agreement was intended to, and by its detail did, resolve all matters — economic and otherwise — between and among the parties thereto resulting from the sale of Essex’s stock by UTC. Nothing was intended by the contracting parties to be left out; and this Court should not presume to the contrary.
All of the foregoing leads back to Paragraph 5.16 of the UTC/Essex Agreement. With emphasis added, it is repeated here.
Insurance. Seller [UTC] expressly recognizes the right of Buyer [MS/Essex Holdings, Inc.] and the Company [Essex] to make claims for coverage under the Seller’s [UTC’s] insurance policies after the Closing with respect to any events occurring prior to the Closing for which coverage is provided to the Company [Essex] under the terms and conditions of such policies.
This Paragraph accomplishes just one thing. It permits Essex to make claims for coverage that is provided under UTC’s Liberty Policies for events occurring before the closing of the UTC/Essex Agreement. This, of course, is exactly what obtained before the closing, when Essex was a wholly owned subsidiary of UTC. The phrase “under the terms and conditions of such policies” modifies the phrase “for which coverage is provided” that immediately precedes it. The phrase “for which coverage is provided” in turn explains what is meant by the word “coverage” in the preceding phrase “claims for coverage.” In short, Paragraph 5.16 permits Essex to make claims on UTC’s Liberty Policies for the kinds of things covered by those policies, provided that such claims arise from events that happened before the date of the closing of the UTC/Essex Agreement. Paragraph 5.16 simply preserves to Essex rights that it had before the closing.
What Paragraph 5.16 does not do, however, is change in any way the position of Essex or UTC with regard to Liberty. UTC’s relationship with Liberty will be determined in the decision on the Rule 56 motion filed by Liberty against UTC. Paragraph 5.16 does not, for instance, shift from UTC to Essex any new or different obligation or burden regarding payment to Liberty of premiums on the Liberty Policies than that which Essex had, if any, before the closing.
Further, the Court finds nothing else in the ,UTC/Essex Agreement — and nothing has been brought to its attention from any of the parties — imposing on Essex, after the closing, any obligation to pay premiums on any of UTC’s Liberty Polices. Nor is there anything in the UTC/Essex Agreement that imposes upon Essex an obligation to indemnify UTC or that causes Essex to have some joint liability with UTC that would support a claim for contribution with regard to premiums due to Liberty on UTC’s Liberty Policies. Given the broad integration clause in the UTC/Essex Agreement, this Court cannot add such obligations and remain consistent with the controlling New York law.
In a similar way, Essex is not being unjustly enriched -with regard to the payment of premiums by UTC on its Liberty Policies. The very detailed UTC/Essex Agreement fails to impose such a burden on Essex. It *629 is not unjust for this Court to hold these sophisticated and well-represented parties to the terms of a contract they freely negotiated.
Nor is any declaratory judgment warranted in UTC’s favor.
UTC’s third-party claim is grounded solely upon Paragraph 5.16 of the UTC/Essex Agreement. Nothing in that Paragraph, or that Agreement — and consequently nothing in the third-party complaint — places upon Essex the premium-payment obligations sought in that third-party complaint.

ORDER

For the foregoing reasons the motion of the third-party defendant, Essex Group, Inc., to dismiss the third-party complaint is ALLOWED.

The Court observes that this allegation, found in Paragraph 11 of the third-party complaint, is a conclusion of law, not an allegation of fact, and thus is open to interpretation by the Court.

The Court does not conclude that this filing converts the Rule 12(b)(6) motion to a Rule 56 motion. The UTC/Essex Agreement is referred to and quoted from in the third-party complaint. Thus, a complete copy of the Agreement is not “matters outside the pleading.”