van Gestel, J.
This matter is before the Court on a motion by the plaintiffs Massachusetts Bar Association and MBA Insurance Agency, Inc. (collectively “MBA”) seeking a preliminary injunction. At issue in the underlying litigation are aspects of the termination of two agreements, one of which calls for resolution by arbitration.

BACKGROUND

The first agreement is between the MBA and the defendant Westport Insurance Corporation (“West-port”) relating to a program of professional liability insurance for MBA members (the “Insurance Agreement”). This Agreement was properly terminated by Westport pursuant to a letter to the MBA dated November 19, 2002. Under the terms of the Insurance Agreement this termination became effective as of January 1, 2004.
A principal issue under the Insurance Agreement relates to the ownership of certain program information upon termination. Section 16 is the key section on this issue. It reads, in its entirety, as follows:
The Insurer [Westport] recognizes and agrees that, in consideration of the services to be provided by the MBA hereunder, any and all information with respect to the identity of all individuals and law firms insured under this Program including, without limitation, the names, addresses and renewal *4 dates with respect to such individuals and law firms insured, shall be the sole and exclusive property of the MBA and shall not be utilized by the Insurer, the Program Administrator or any other person except (i) as may be specifically authorized in writing by the MBA; (ii) as may be required by a state regulatory authority or by court order; or (iii) in connection with the operation of the MBA Endorsed Program described in this Agreement during the term hereof. The Insurer hereby agrees that any and all such information shall be maintained on a strictly confidential basis; may not be transferred, sold, assigned or utilized by any person without the prior written consent of the MBA; upon the termination of this Agreement, shall be returned to the MBA for its free and exclusive use for whatever purposes it chooses; and any and all copies of which are necessary to be maintained by the Insurer are to be kept on the same strictly confidential basis as set forth above. The foregoing prohibition on the use of said information shall extend for a period of five (5) years following the termination of this Agreement, during which period of time the Insurer agrees not to use any information gained from this Program, including, without limitation, the confidential information set forth above, to compete in the Commonwealth of Massachusetts against any insurance program for attorneys’ professional liability insurance endorsed by the MBA.
The second agreement in issue was originally between the MBA Insurance Agency, Inc. (the “MBA Agency”) and Coregis Insurance Company (“Coregis”). This agreement will be referred to herein as the “Agency Agreement.” By an amendment executed in the summer of 2000 Westport replaced Coregis under the Agency Agreement.
The Agency Agreement sets forth the obligations of the MBA Agency and Westport with regard to administering the MBA Endorsed professional liability insurance program.
When Westport sent its notice to the MBA terminating the Insurance Agreement effective January 1, 2004, it took no action with regard to the Agency Agreement.
On December 16, 2003, the MBA Agency notified Westport that it “considered the termination by West-port of the [Insurance Agreement with the MBA] as notice to the MBA Insurance Agency that the Program Administrator Agreement [the Agency Agreement] would also be terminated effective December 31, 2003.” In the notice, the MBA Agency, “out of an abundance of caution and reserving all of our rights,” included notice under Paragraph 7C of the Agency Agreement that it considered that Agreement to be terminated.
In the foregoing posture, the MBA Agency, believing that it had no insurance to provide for MBA members, entered into an agreement with CNA, effective January 1, 2004, for the MBA Endorsed insurance program. MBA members were notified of this change by, among other things, an Internet Notice posted on December 22,2003.
Westport, citing to certain termination provisions in the Agency Agreement, challenged the MBA Agency’s actions in signing up with CNA before the expiration of a 180-day advance written notice provision for a termination without cause. By letter dated December 23, 2003, Westport advised the MBA Agency that Westport considered the MBA Agency’s action a breach of the Agency Agreement, for which Westport announced it was terminating the Agency Agreement immediately for cause.
In February of 2004, Westport began certain filings with the Massachusetts Commissioner of Insurance in anticipation of its intention to begin selling professional liability insurance to Massachusetts lawyers starting on May 1, 2004. Included in these filings were gross-number recitals of Westport’s insurance experience in Massachusetts. This information had to have been taken from the MBA Endorsed program because that was the only program that Westport operated under in Massachusetts for the periods in issue.
The MBA argues that Westport cannot use any information from the MBA Endorsed Program for any purpose, including the kinds of filings made with the Commissioner of Insurance. Further, the MBA states that Westport cannot even begin selling professional liability insurance to Massachusetts lawyers on May 1, 2004, but instead must wait until June 15, 2004, the expiration of the 180-day period in the Agency Agreement.
Westport, arguing that the MBA Agency is in breach, says that it should be able on May 1, 2004, to begin selling its professional liability insurance through the Number One Insurance Agency, Inc. and the Massachusetts Association of Insurance Agents. Further, Westport contends that its use of “its own” experience in Massachusetts, particularly in the form of gross aggregate numbers, is not a violation of the ownership of program information clause of the Insurance Agreement.

DISCUSSION

In order to prevail on its request for preliminary injunctive relief, the MBA bears the burden of showing: its likelihood of success on the merits; that it will suffer irreparable harm if the injunctive relief sought is not granted; and that its harm, without the injunction, outweighs any harm to the defendants from being enjoined. GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 (1993); Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980).
In assessing the likelihood of success prong, the Court must, in a preliminary fashion at least, interpret aspects of the two agreements in issue.
*5 To some extent the Court should consider the issues like it would a Rule 12 motion to dismiss. All well-pleaded allegations of the MBA’s complaint should be considered admitted, and the Court should accept as true such inferences as may be drawn in the MBA’s favor. Blank v. Chelmsford Ob/Gyn P.C., 420 Mass. 404, 407 (1995); Natick Auto Sales, Inc. v. Department of Procurement and General Services, 47 Mass.App.Ct. 625, 630 (1999). Of course, conclusions of law from the facts alleged remain open for review.
The interpretation of an unambiguous agreement is an issue of law for the Court. Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). A contract provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation Ins. Co., at 381. The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. Lumbermans Mat. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
When an element of ambiguity does appear in a contract, the Court considers the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms. MacDonald v. Gough, 326 Mass. 93, 96 (1950). “The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the agreement as a rational business instrument in order to cany out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
With this background the Court reviews the two underlying agreements to get a sense for whether the MBA has demonstrated a likelihood of success on the merits of its claims under them. The Court, of course, has not had a trial on this case and, therefore, its determination here is not necessarily the last time it may have to assess the agreements.
The Court begins with the Insurance Agreement. Westport had a contractual right to terminate the Insurance Agreement in the manner that it did. Indeed, the MBA does not claim otherwise. Therefore the first issue that needs clarification is the meaning and reach of the language in Section 16 relating to the ownership of program information.
The first sentence deals with “any and all information with respect to the identity of all individuals and law firms insured under this Program including, without limitation, the names, addresses and renewal dates with respect to such individuals and law firms.” This language relates solely, albeit broadly, to the identity of the individuals and law firms insured. This does not include the gross numbers resulting from Westport’s experience under the program in Massachusetts.
The third sentence is what the MBA relies upon, particularly the language therein reading “the Insurer agrees not to use any information gained from this Program, including, without limitation, the confidential information set forth above.” The MBA argues that the words “any information gained from this Program,” is not limited to the “confidential information set forth above” which relates only to the identity of the insureds.
At this stage of this litigation, this Court is not willing to give the clause the broad reading urged by the MBA, at least not such as reaches the information provided by Westport to the Commissioner of Insurance. At the same time, the language is clearly to be read as broadly as possible regarding “any information gained from this Program” that relates in any identifiable way to the identity of the insureds. Thus, as to the latter, the MBA has shown its likelihood of success.
Next the Court turns to the Agency Agreement and the issue of the effect of its termination on when Westport can begin selling again in Massachusetts, May 1, 2004 or June 15, 2004. This assessment gets tangled in the web of the effect of the MBA Agency’s “termination” notice on December 16, 2003.
If the Agency Agreement stands alone, then it was not terminated by the termination of the Insurance Agreement and the MBA Agency’s engagement of CNA could be considered a breach of the exclusivity in Addendum A, Section II. At this stage of the proceedings, however, this Court is of the opinion that the Agency Agreement between Westport and the MBA Agency cannot be read in isolation from the Insurance Agreement between Westport and the MBA. Both relate to the parties’ rights and duties and the mechanics of operating the MBA professional liability program. If Westport has — as all parties agree — validly terminated its obligation to be the carrier on the program it would seem that its action must be considered to have the same effect with regard to the Agency Agreement with the MBA Agency which is the only agent entitled to market Westport’s policies under the MBA Endorsed program. That being the case, the MBA Agency would not be in breach of the Agency Agreement and West-port would not be able to avoid the 180-day notice period. In short, at this time, this Court is satisfied *6 that the MBA has shown its necessary likelihood of success on the issue that June 15, 2004, rather than May 1, 2004, is the significant date by which Westport can begin issuing policies outside of the MBA program.
The Court next looks at the issue of irreparable harm. It finds the possibility of such harm with regard to the records relating to the identity of the insureds. However, it finds money damages a more than adequate remedy on the issue of whether the starting date for Westport’s new venture is May 1, 2004, or June 15, 2004.

ORDER

For the foregoing reasons, the defendant Westport Insurance Corporation, its agents, servants, employees and attorneys, and any persons or entities acting in concert with it, are restrained and enjoined until January 1, 2009, from directly or indirectly using any MBA proprietary data with respect to the identity of all individuals and law firms insured under the MBA Endorsed Program in issue in this case, including, without limitation, the names, addresses and renewal dates with respect to such individuals and law firms insured, all except as may be required solely for tax reporting, reporting to states and regulatory agencies and other rating bureaus or to administer existing policies.
Further, Westport Insurance Corporation is Ordered, within 20 business days from the date hereof, to return to the MBA any MBA proprietary data with respect to the identity of all individuals and law firms insured under the MBA Endorsed Program in issue in this case, including, without limitation, the names, addresses and renewal dates with respect to such individuals and law firms insured, except as may be required to administer existing known policy claims, as to which a list of such claims shall be made and delivered to the MBA; provided that the MBA is to retain such information and make copies thereof available to Westport Insurance Corporation should the same be needed for the processing of any claims or responding to regulatoiy requests.

FURTHER THIS MATTER IS STAYED PENDING RESOLUTION OF THE ARBITRATION DEMANDED BY THE MBA PARTIES.